UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

MONTEFIORE MEDICAL CENTER,

                                        Plaintiff,

                 -against-

LOCAL 272 WELFARE FUND, et al.,

                                        Defendants.

----------------------------------------------------------------X

SARAH NETBURN, United States Magistrate Judge.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 12/2/2016 _
```

14-CV-10229 (RA)(SN)

**REPORT &
RECOMMENDATION**

TO THE HONORABLE RONNIE ABRAMS:

This case involves the proper rate required to be paid by Defendant Local 272 Welfare Fund (the "Fund") for hospital services its members and their dependents received at Montefiore Medical Center ("Montefiore"). The Fund's Summary Plan Description provides that it will reimburse members for out-of-network hospital services at "the maximum amount the Fund would have paid an in-network provider for the same services." Montefiore has sued the Fund, alleging that the Fund's reimbursement amount was substantially less than what the Summary Plan Description requires. Both parties have moved for summary judgment. Applying a *de novo* review of the Fund's determinations, the Court recommends GRANTING Montefiore's motion for summary judgment, and DENYING the Fund's motion.

## FACTUAL BACKGROUND

The distribution of health care benefits and other coverage to the Fund's 5,100 participants and beneficiaries is governed by a Summary Plan Description ("SPD" or the "Plan"), an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C.

§ 1002(1). The Fund is self-insured, which means that it pays claims for coverage and health benefits directly from employee contributions. The administration of the Fund is delegated to the Board of Trustees and Marc Goodman ("Goodman"), the Fund Manager. The SPD, which is subject to ERISA and the regulations promulgated thereunder,[1] sets forth eligibility requirements, type of benefits provided, covered services, limitations on coverage, and procedures for obtaining benefits and for appealing a denial or partial denial of benefits. The SPD functions as the "entire Plan of Benefits," and is "not actually a 'summary' of a lengthier or more extensive plan of benefits." Barker Decl., Exh. A at n.2 (ECF No. 50).

The Plan distinguishes between in-network and out-of-network providers. Under the Fund's agreement with MagnaCare Administrative Services LLC ("MagnaCare") in establishing a preferred provider organization ("PPO"), Fund participants who visit an in-network provider pay only a $25 copay, with the Fund assuming the balance. The SPD explains to members that they are entitled to see doctors outside of the PPO but that doing so maybe more expensive than seeing an in-network provider.

Montefiore, a hospital located in the Bronx, is currently an out-of-network provider for Fund beneficiaries after opting out of participating in the PPO in August 2008. Montefiore does not offer discounted rates or admit Fund participants in non-emergency situations, but provides urgent care services to participants at its market rate and bills them directly. A group of participants who received urgent care services at Montefiore assigned their rights to reimbursement from the Fund to Montefiore.

---

[1] The SPD states, "As a participant in the Local 272 Welfare Fund, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA)" and articulates a series of rights to which members of the Fund are entitled. Goodman Decl., Exh. A at D0134-D0139 (ECF No. 49-2). The Plan also informs participants that if a claim for benefits is denied or ignored, in whole or in part, they may "file suit in a state or federal court." Id. at D0137.

The SPD requires the Fund to reimburse these claims at the "maximum amount the plan would have paid an in-network provider for the same service." Declaration of Marc Goodman ("Goodman Decl."), Exh. A at D0044 (ECF No. 49-1). Montefiore argues that the term "maximum" means "the same amount [the Fund] would have had to pay had the member instead gone to the in-network hospital that charges the Fund the most for the particular services at issue." Plaintiff's Reply Memorandum of Law ("Pl.'s Reply Mem.") at 22 (ECF No. 57). The Fund, however, contends that "maximum" means the maximum <u>allowable</u> amount, or the rate that the Fund would have paid an in-network hospital in the "geographic vicinity" that provides the same services as the out-of-network hospital. Defendants' Rule 56.1 Statement at ¶ 33 (ECF No. 52); Declaration of Jane Lauer Barker ("Barker Decl."), Exh. C at 24:15-25:5 (ECF No. 50-3). According to the Fund, the "maximum" amount owed to Montefiore is the "per diem rate paid by the Fund for services at Jacobi Medical Center in the Bronx." Defendants' Rule 56.1 Statement at ¶ 21 (ECF No. 52); Barker Decl., Exh. C at 12:6-10 (ECF No. 50-3).

The SPD does not specify which in-network provider rate the Fund applies to an out-of-network claim, or that the Fund uses geographic proximity or comparability of services as a factor for selecting an in-network provider. Defendants' Rule 56.1 Statement at ¶ 32 (ECF No. 52); Barker Decl., Exh. C at 31:9-13 (Exh. 50-3). The Explanation of Benefits forms ("EOBs") show that the Fund has not paid in full Montefiore's actual bills, but has instead paid amounts far less. The EOBs do not indicate the in-network provider rate that was applied to the submitted charges, but note that a payment was not fully covered because "CLAIM PAID AS OUT OF NETWORK PROVIDER UNDER PLAN." <u>See, e.g.</u> Declaration of John G. Martin ("Martin Decl."), Exh. B at D0184, D0214, D0216 (ECF No. 61-2).

Montefiore appealed to the Fund on June 13, 2013, alleging, among other issues, that thirteen specific EOBs failed to provide any details as to how the reimbursement rates were calculated and why the amounts paid were less than the total amount of the bills. After requesting in July 2013 that Montefiore provide more information as to the claims, the Board of Trustees responded in December 2013 that the appropriate in-network provider rate for an out-of-network provider was based on factors including "the locality of the providers and whether the providers provide the same or similar types of services." Goodman Decl., Exh. E at D0154-D0155 (ECF No. 49-6). The Board informed Montefiore that Jacobi Medical Center was selected as the comparable in-network provider for Montefiore because "it is a general medical and surgical hospital located in the Bronx, the same geographic area of Montefiore, and it provides the same or similar services as does Montefiore, utilizing some of the same providers and physicians who provide services at Montefiore." Id. at D0155. According to the Board, interpreting "maximum" to mean the "highest reimbursement amount that [the Fund] would pay to any in network provider" was "absurd," as the Fund would be required to use those rates that "it does not in fact pay or even know about." Id.

## PROCEDURAL BACKGROUND

Montefiore has previously litigated the issues of preemption and standing. Montefiore Med. Ctr. v. Teamsters Local 272, 09-cv-3096 (HB), 2009 WL 3787209 (S.D.N.Y. Nov. 12, 2009). In December 2014, Montefiore filed a complaint against the Fund and Goodman, alleging, among other claims, that the Fund violated ERISA by failing to pay in full Montefiore's pre-certified urgent care claims since 2008. Montefiore sought both monetary damages under ERISA § 502(a)(1)(B) and an injunction under § 502(a)(3). This Court found that "Montefiore's patients assigned their rights to monies and/or benefits [...] to cover the costs of care and

treatment," which gave Montefiore "a right to sue for damages under § 502(a)(1)(B)."

Montefiore Med. Ctr. v. Local 272 Welfare Fund, et al., 14-cv-10229 (RA)(SN), 2015 WL
7970026, at *3 (S.D.N.Y. Oct. 19, 2015).

These competing motions for summary judgment followed discovery.

**DISCUSSION**

## I.    Summary Judgment Standard

The court "shall grant summary judgment if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party must
show that "under the governing law, there can be but one reasonable conclusion as to the
verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

The moving party "bears the initial responsibility" of demonstrating "the absence of a
genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case
will identify those facts that are material, and only "disputes over facts that might affect the
outcome of the suit under the governing law will properly preclude the entry of summary
judgment." Anderson, 477 U.S. at 248. "Even where facts are disputed, in order to defeat
summary judgment, the nonmoving party must offer enough evidence to enable a reasonable jury
to return a verdict in its favor." Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 101 (2d
Cir. 2001).

In determining whether summary judgment is appropriate, a court must resolve all
ambiguities and draw all reasonable inferences in the light most favorable to the non-moving
party. See Scott v. Harris, 550 U.S. 372, 378 (2007); Matsushita Elec. Indus. Co. v. Zenith Radio
Corp., 475 U.S. 574, 587 (1986). Summary judgment is improper if there is any evidence in the

5

record from any source from which a reasonable inference could be drawn in favor of the non-moving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). To show that there is a disputed fact sufficient to deny summary judgment, the non-moving party must produce evidence and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993). Rather, a party's response "must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation and internal quotation marks omitted).

Where both parties have moved for summary judgment, the same legal standards apply. Morales v. Quintel Entm't Inc., 249 F.3d 115, 121 (2d Cir. 2001). Neither party's motion need be granted if the court finds the existence of disputed material facts. Id. (citing Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993)). Therefore, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (citing Schwabenbauer v. Board of Ed., 667 F.2d 305, 314 (2d Cir. 1981)).

## II.    Judicial Review of an ERISA Benefits Plan

Judicial review of an ERISA benefits plan is *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); see also Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 249 (2d Cir. 1999); Rubio v. Chock Full O'Nuts Corp., 254 F. Supp. 2d 413, 421 (S.D.N.Y. 2003). If the plan grants the administrator such discretionary authority, a court may reverse the administrator's decision only if the decision is arbitrary and capricious. Firestone Tire & Rubber Co., 489 U.S. at 115;

Zervos v. Verizon New York, Inc., 277 F.3d 635, 650 (2d Cir. 2002); Zuckerbrod v. Phoeniz

Mutual Life Ins. Co., 78 F.3d 46, 49 (2d Cir. 1996). Under the arbitrary and capricious standard,

the plan's decision may be overturned only if the decision is "without reason, unsupported by

substantial evidence or erroneous as a matter of law." Pagan v. NYNEX Pension Plan, 52 F.3d

438, 442 (2d Cir. 1995) (internal citation and quotation marks omitted). It is the burden of the

plan administrator to demonstrate that the plan gives the plan administrator the discretionary

authority to construe the plan's terms. Firestone Tire and Rubber Co., 489 U.S. at 115.

The SPD grants the Board of Trustees discretionary authority to construe the Plan's

terms. According to the section titled "Important Information About the Welfare Fund":

> The Board of Trustees and/or its duly authorized designee(s) has the exclusive right,
> power and authority, in its sole and absolute discretion, to administer, apply and
> interpret the Plan, including this booklet, the Trust Agreement and any other Plan
> documents, and to decide all matters arising in connection with the operation or
> administration of the Fund or Trust.

Goodman Decl., Exh. A at D0128 (ECF No. 49-2). The SPD further specifies, "All

determinations and interpretations made by the Board of Trustees and/or its duly authorized

designee(s) shall be final and binding upon all participants, beneficiaries, and any other

individuals claiming benefits under the Plan." Goodman Decl., Exh. A at D0129 (ECF No. 49-2).

Under the SPD, the Board of Trustees of the Local 272 Welfare Fund also has the

authority to:

> (1) formulate, interpret and apply rules, regulations and policies necessary to
> administer the Plan in accordance with the terms of the Plan;

> (2) decide questions, including legal or factual questions, relating to the calculation and
> payment of benefits under the Plan;

> (3) resolve and/or clarify any ambiguities, inconsistencies and omissions arising under
> the Plan, including this booklet, the Trust Agreement or other Plan documents;

> (4) process and approve or deny benefit claims; and

(5) determine the standard of proof required in any case.

Goodman Decl., Exh. A at D0128-D0129 (ECF No. 49-2).

Ordinarily, the SPD's express grant of discretionary authority to the Board of Trustees should dictate review under the arbitrary and capricious standard. See Firestone Tire and Rubber Co., 489 U.S. at 115; Demel v. Grp. Benefits Plan for Employees of Northern Telecom, Inc., 07-cv-00189 (GBD), 2012 WL 1108311, at *3-4 (S.D.N.Y. Mar. 30, 2012) (holding that language granting a plan administrator the authority to "resolve all disputes and ambiguities related to the interpretation of a benefits plan" is sufficient to trigger arbitrary and capricious review). The Court, however, considers whether, under Halo v. Yale Health Plan, Director of Benefits & Records Yale Univ., 819 F.3d 42 (2d Cir. 2016), de novo review instead should apply. In Halo, the plaintiff was denied coverage under her university's health plan when she sought out-of-network treatment and contested both the timing and content of the explanations for the denials. 819 F.3d at 46. The Court of Appeals ruled that "when denying a claim for benefits, a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503–1, will result in that claim being reviewed de novo in federal court, unless the plan has established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent and harmless." 819 F.3d at 60-61 (emphasis in original).

The Fund argues that Halo is inapposite. First, according to the Fund, the U.S. Department of Labor's underlying policy goal of protecting the direct participants and beneficiaries of employee benefit plans is "inapplicable to a dispute between a hospital and a payor of hospital bills." Defendants' Memorandum of Law in Opposition ("Dfs.' Opp.") at 14 (ECF No. 51). Therefore, Montefiore, as an assignee of the Fund beneficiaries' right to payment,

is not entitled to *de novo* review under <u>Halo</u>. <u>Id.</u> at 14-15. Second, the Fund argues that Montefiore has not established that the Fund failed to follow claims procedure regulations because some of the claims were processed within 30 days, and the statement on the EOBs that a claim was paid as an out-of-network claim was "specific and refer[red] to an SPD provision." <u>Id.</u> at 15.

The Court agrees with Montefiore that, notwithstanding the SPD's grant of discretion to the Board of Trustees, *de novo* review should apply. The Fund's characterization of this lawsuit as "a dispute between a hospital and a payor of hospital bills," where the "hospital sues an insurer or an ERISA fund seeking more money," is an oversimplification. Montefiore stands in the shoes of the Fund's beneficiaries with respect to the "rights to monies and/or benefits . . . to cover the costs of care and treatment" that originally belonged to the beneficiaries. <u>Montefiore Med. Ctr. v. Local 272 Welfare Fund, et al.</u>, 14-cv-10229 (RA)(SN), 2015 WL 7970027, at *3 (S.D.N.Y. Oct. 19, 2015) (internal quotation marks removed). Those "rights to monies and/or benefits" implicate the Fund's application of the coverage rules and regulations governing health benefits for Fund beneficiaries. Indeed, the Fund concedes that "Montefiore's patients would under <u>Halo</u> in a federal lawsuit be entitled to the benefit of a *de novo* review." Dfs.' Opp. at 15 (ECF No. 51). The Fund does not cite, and the Court is unable to find, any authority for its proposition that an assignee holding the same "rights to monies and/or benefits" is subject to a different, more deferential standard of review than a direct beneficiary.

The Court of Appeals in <u>Halo</u> based the appropriateness of *de novo* review on its finding that the university health plan's denials of coverage were repeatedly untimely and failed to provide explanations for why the plan was denying coverage. <u>Id.</u> at 59. Similarly, for many of the thirteen claims that Montefiore submitted to the Board of Trustees for appeal, the Fund did

not follow its internal claim review procedures or Department of Labor ("DOL") guidelines.

Several EOBs reflect almost a two-month lapse between the "Date Received" and the "Date

Processed" fields, well beyond any deadlines set forth in the SPD. See, e.g. Martin Decl., Exh. B

at D0176 (Claim B-27), D0253 (Claim B-22), D0204 (Claim B-22) (ECF No. 61-4). The Fund

contends that, although its policy is to process and issue determinations within 30 days of

receiving the claims, it has "the right to extend this time period in order to obtain additional

information from the participant or the provider if required in order to process such a claim."

Goodman Decl. at ¶ 24 (ECF No. 49); see also Reply Declaration of Marc Goodman ("Goodman

Reply Decl.") at ¶ 16 (ECF No. 64). The Fund also points to claims B-1, B-2, and B-4 as

examples in which any delays in processing were a result of Alicare Medical Management

("Alicare"), the entity responsible for issuing pre-certification determinations, seeking more

information about the claim. Goodman Reply Decl. at ¶¶ 12-14 (ECF No. 64). But nothing in the

record establishes that Alicare (or the Fund itself) attempted to obtain additional information

with respect to claims B-27 and B-22 that required significant delay.

     In addition, the SPD requires that any adverse determination must contain, among other

information, (1) the "specific reason(s) for the determination; (2) "[r]eference to the specific Plan

provision(s) on which the determination is based; and (3) a copy of any "internal rule, guideline,

or protocol . . . relied upon in deciding your claim." Goodman Decl., Exh. A at D0114-D0115

(ECF No. 49-2). Applicable DOL regulations also mandate that notifications of adverse

determinations include (1) the "specific reason or reasons for the adverse determination," (2) the

"specific plan provisions on which the determination is based," and (3) a description of the

plan's review procedures, deadlines, and the claimant's right to bring a civil action. 29 C.F.R. §

1133(1). But the Fund's cited explanation, "Claim Paid as Out-of-Network Provider Under Plan"

(Goodman Decl. at ¶¶ 25, 30 (ECF No. 49); Dfs.' Opp. at 15 (ECF No. 51)), is not specific at all. This explanation references no provision, page number or section of the SPD. Other explanations in the EOBs, such as "Code No Longer Used in Plan" and code number "375," are similarly mystifying. For example, for claim B-26, "Code No Longer Used in Plan" accounts for approximately $32,000 in hospital expenses. The Fund dismisses the use of "Code No Longer Used in Plan" because two other codes were assigned to that specific expense, but does not address the fact that the beneficiary is still entitled to know why $32,000 of a hospital bill will not be reimbursed.

Accordingly, the Court finds that the Fund's interpretation of the SPD is subject to *de novo* review.[2]

## III. Interpretation of the "Maximum" Reimbursement Provision

The proper interpretation of an ERISA plan contract is a matter of law. See Niedermaier v. Southern Tier Bldg. Trades Ben. Plan, 62 F. Supp. 3d 275, 280 (S.D.N.Y. 2014). Federal courts interpreting ERISA plans employ the "familiar rules of contract interpretation." Lifson v. INA Life Ins. Co. of N.Y., 333 F.3d 349, 352-53 (2d Cir. 2003). Under a *de novo* standard of review, courts in this circuit construe the terms in ERISA plans in accordance with federal common law and give the terms of the plan their plain meanings. Fay v. Oxford Health Plan, 287 F.3d 96, 104 (2d Cir. 2002). If a contract can reasonably be interpreted in two different ways, neither party is entitled to summary judgment. See L.K. Comstock & Co., Inc. v. Perini Corp., 903 F.Supp. 609, 610 (S.D.N.Y. 1995); Dorlexa Co. v. Barclaysamerican/Business Credit, Inc., 90-cv-06450 (LBS), 1992 WL 75133, at *4 (S.D.N.Y. Mar. 30, 1992). Moreover, ambiguities are to be construed against the drafter of the disputed document. See I.V. Services of Am., Inc. v.

---

[2] As discussed further below, even under a deferential review, the Court would recommend finding that the Fund's decision was arbitrary and capricious.

Trustees of Am. Consulting Engineers Council Ins. Trust Fund, 136 F.3d 114, 121-22 (2d Cir. 1998); Rubio, 254 F. Supp. 2d at 427-28; Kascewicz v. Citibank, N.A., 837 F. Supp. 1312, 1318 (S.D.N.Y. 1993).

     Although parties may disagree as to the meaning of specific clauses in an agreement, the Court's task is "to determine whether such clauses are ambiguous when read in the context of the entire agreement." Sayers v. Rochester Telephone Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1095 (2d Cir. 1993) ("By examining the entire contract, we safeguard against adopting an interpretation that would render any individual provision superfluous."); see also Loughman v. Unum Provident Corp., 536 F. Supp. 2d 371, 375 (S.D.N.Y. 2008). Language is ambiguous only when it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire . . . agreement." O'Neil v. Ret. Plan for Salaried Employees of RKO Gen., Inc., 37 F.3d 55, 59 (2d Cir. 1994) (internal quotation marks and citations omitted). But the language of a contract is not ambiguous simply because the parties urge different interpretations or if one party's view "strains the contract language beyond its reasonable and ordinary meaning." Command Cinema Corp. v. VCA Labs, Inc., 464 F. Supp. 2d 191, 198–99 (S.D.N.Y. 2006).

     In the section titled, "More About the Fund's Network and In-Network and Out-of-Network Services," the SPD states that, for out-of-network services, the employee is required to "pay any difference between the amount that an out-of-network provider charges and *the maximum amount the Plan would have paid an in-network provider for the same service*." Goodman Decl., Exh. A at D0044 (ECF No. 49-1) (emphasis added). Montefiore also cites the Example on the next page of the SPD as evidence that the Fund's obligation is up to the maximum it pays in-network providers and not some lesser amount.

The Example provides:

Assume that you go to a doctor who accepts assignment of your balances. You pay a $25 copay and the Plan pays the balance – there is no other cost to you.

Suppose you instead sought out-of-network care for the same condition, and the out-of-network doctor charged you $125. For network services, the maximum the Plan would recognize is $100 (less the $25 copay), not $125. So that is all the Fund will recognize in this case. After you submit a claim form for the $125 you paid the doctor, the Fund will pay you $75 ($100 less $25). In addition to the $25 copay, you are responsible for the $25 the doctor charged that exceeded the Plan's reimbursement level, so the total amount you will be required to pay out of pocket for this service is $50.

Goodman Decl., Exh. A at D0045 (ECF No. 49-1).

The SPD's language is unambiguous as a matter of law. It sets the reimbursement rate at precisely "the maximum" that the Fund pays "an in-network provider for the same service." This means that the Fund needs to determine what it pays its various in-network providers for a particular service, and then select the "maximum," or highest, amount. Modifying these plain words—to allow, for example, that the "maximum" is limited to the rate for an in-network provider *in the same geographic region*, or to an in-network provider *of the similar caliber*—would require the Court to ignore the plain text and rewrite the Plan.

Of course, the Fund is free, even now, to amend the SPD to erase any incentive for members to go out of network. As drafters, it can write the SPD to withhold *any* reimbursement for out-of-network treatment. It could set its reimbursement rate to be a percentage of the maximum paid to an in-network provider. Or it could include limitations such as geographic regions or institutional standards. But the Fund cannot interpret the term maximum to mean anything less than just that: the maximum that it pays to any in-network provider.

In addition to a plain language interpretation, the Court must interpret "ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience."

Critchlow v. First Unum Life Ins. Co. of Am., 378 F.3d 246, 256 (2d Cir. 2004) (internal

citations omitted). The SPD must summarize the provisions of an ERISA contract in a way that

is "calculated to be understood by the average plan participant." 29 U.S.C. § 1022(a); see Moore

v. Metropolitan Life Ins. Co., 856 F.2d 488, 491 (2d Cir. 1998) (holding that the SPD "must not

have the effect of misleading, misinforming or failing to inform participants and beneficiaries"

with respect to a plan's provisions); Heidgerd v. Olin Corp., 906 F.2d 903, 907-08 (2d Cir. 1990)

("[T]he summary will be an employee's primary source of information regarding employment

benefits, and employees are entitled to rely on the descriptions contained in the summary."). Any

limitations or restrictions on plan benefits must not be minimized, rendered obscure or otherwise

made to appear unimportant, but must instead be referenced within a "relevant section of the

[summary plan description]." Burke v. Kodak Ret. Income Plan, 336 F.3d 103, 111 (2d Cir.

2003).

Guided by this case law, any limitations or restrictions on the Plan must be readily

apparent with clear language so that participants will understand the extent of any medical debt

to which they may be exposed. To adopt the Fund's interpretation would mislead Plan

participants about their rights. There is nothing in the SPD that would put them on notice that the

reimbursement rate for out-of-network providers was subject to the Funds discretionary

limitations. The SPD does not indicate that the Fund can consider geographic proximity or

similarity of service in setting the reimbursement rate. Rather, the plain language adopts an

objective, non-discretionary standard.

Finally, the Court can consider the Plan as a whole. Nothing in the rest of the SPD

suggests that the Fund's interpretation is reasonable. Rather, other provisions are consistent with

the Court's plain-language reading of the SPD. For example, an employee turning to the

beginning of the SPD would see the following in the introductory section, "Your Benefits at a Glance":

> When services are provided out-of-network, the Plan pays *the same amount it would have paid a member of the Plan's network*, and you are responsible for any amount the provider charges that is more than what the Fund allows.

Goodman Decl., Exh. A at D0010 (ECF No. 49-1) (emphasis added). Although this provision does not contain the word "maximum," it plainly states that the Fund will pay "the same amount" that it would pay to "a member of the Plan's network." A Plan participant would not reasonably understand this provision to limit the Fund's obligation to something *less than* "the same amount," or to only *certain* "members of the Plan's network." The Fund argues that the terminal phrase "what the Fund allows" grants it full discretion. That is sophistry. What the Fund allows is set forth in unambiguous terms: it will pay the maximum amount it pays to an in-network provider.

The "At a Glance" section of the SPD also informs participants that, with respect to prescription drug benefits and dental benefits, the Fund covers the amount that a participating pharmacy or dentist would have received:

> If you go to an "out of network" retail pharmacy, you have to pay the pharmacy's regular charge up front and submit a claim for reimbursement. You are responsible for the copay plus any difference between *the amount the Plan would have reimbursed a participating pharmacy for that medication* and the amount actually charged by your pharmacy. Goodman Decl., Exh. A at D0011 (ECF No. 49-1) (emphasis added).
>
> . . .
>
> If you go to a dentist outside of the DDS network, you must pay the entire cost up front and file a claim with DDS for reimbursement. You will be reimbursed *up to the applicable allowed amount*, less the copay. If your dentist charges more than the allowed amount, you will also be responsible for that additional amount.

Goodman Decl., Exh. A at D0012 (ECF No. 49-1) (emphasis added).

The more detailed sections located further in the SPD repeat, almost word-for-word, the substance of the "At a Glance" section. For example, if an employee is seeking prescription drugs from a non-participating pharmacy, the SPD asserts:

> If you go to an out-of-network pharmacy, you will have to pay the full amount and submit a claim to NMHC for reimbursement. The Plan will reimburse you *the same amount that it would have reimbursed a participating pharmacy*. You are responsible for your copay ($15 or $30), plus any difference between *the rate at which the Plan reimburses a participating pharmacy* and the amount charged by your pharmacy.

Goodman Decl., Exh. A at D0077 (ECF No. 49-2) (emphasis added). Similarly, regarding non-participating dental providers, the SPD provides:

> If you go to a non-participating provider, you must pay the full charge up front. You can file for reimbursement with DDS, who will reimburse you *up to the "allowed amount" for that service, less any applicable copay*. If the non-participating provider charges you more than the allowed amount, you will be responsible for the additional amount (as well as the copay).

Goodman Decl., Exh. A at D0081 (ECF No. 49-2) (emphasis added).

Having failed to convince the Court that it could faithfully interpret the SPD in the manner suggested by the Fund, the Court considers the parade of horribles envisioned by the Fund if "maximum" is to be read plainly. First, Fund members currently have the choice of selecting the most expensive in-network provider for a given service. Therefore, the risk of paying an out-of-network claim at the highest that the Fund would have paid an in-network provider is one that the Fund has already assumed.

Second, the Fund has not raised any specific evidence in support of its argument that applying Montefiore's interpretation would be unduly burdensome to carry out. The Fund is perfectly capable of requesting in-network rates from MagnaCare. See Goodman Decl., Exh. B (ECF No. 49-3) ("The Local 272 Welfare Fund pays all claims using the MagnaCare Fee Schedule."). Although a hospital bill may contain an assortment of medical services rendered,

the Fund has not demonstrated that retrieving the in-network rates for each medical service and determining the highest rate will be impossible or overly difficult.

Third, nothing in the record supports the notion that if Fund beneficiaries are reimbursed at the maximum that an in-network provider would have been paid, those beneficiaries will seek out-of-network providers at the expense of in-network providers, thereby prompting in-network providers to flee the MagnaCare PPO. It is unlikely that a policy of paying out-of-network claims at the maximum paid to an in-network provider for all 5,100 members of a small union employee welfare fund will sway an in-network provider to leave the protections of the MagnaCare PPO. Moreover, barring an emergency situation, members are already incentivized to choose in-network providers. Members who choose in-network treatment have the predictability of knowing exactly what they will pay for that treatment. Those who choose (or who are forced to choose) an out-of-network provider must go through the inconvenience and uncertainty of submitting bills and waiting for future reimbursement.

## III.     Claim B-11's Exhaustion of Remedies

Plaintiffs asserting a claim under § 1132(a)(1)(b) are required to exhaust administrative remedies before filing an action in federal court, unless exhaustion would be futile. Jones v. Unum Life Ins. Co. of Am., 223 F.3d 130 (2d. Cir. 2000). The Fund concedes that all claims but one have been exhausted or exhaustion would be futile and is therefore excused. The Fund, however, challenges claim B-11 as unexhausted and for which exhaustion would not be futile.

The Fund asserts that the patient involved in claim B-11 did not obtain precertification from Alicare Medical Management before receiving services at Montefiore, and that the claim was therefore properly denied. Montefiore did not raise on appeal to the Fund any objection to the denial of claim B-11 on precertification grounds. Montefiore, however, claims that the

patient changed his/her name between precertification and hospital admission, and that claim B-11 was therefore submitted under a different patient name than the name sent to Alicare for precertification.

The Court has reviewed the following documents in connection with claim B-11: (1) the redacted January 9, 2013 letter from Alicare to Montefiore denying regarding the denial of precertification for this claim (Goodman Reply Decl., Exh. 3 (ECF No. 64)); (2) the unredacted payment form submitted by Montefiore to the Fund for claim B-11 (Declaration of Karen DelCasale, Exh. B at B-11 (ECF No. 62-1)); and (3) the unredacted EOB issued by the Fund for claim B-11 (Martin Decl., Exh. B at D0160 (ECF No. 61-3)). The initial letter from Montefiore to Alicare allegedly containing the wrong name is missing from the record, as well as the unredacted version of the January 9, 2013 letter from Alicare. Montefiore also has yet to confirm whether it failed to submit any appeal to Alicare regarding the denial of precertification. It is true that Montefiore only disclosed the patient's name for claim B-11 in its June 2013 appeal to the Board of Trustees, and did not provide any kind of objection to the precertification determination. But given that this issue involves background facts that are not presently in the record (such as whether the patient's name was correctly stated in the correspondence from Montefiore to Alicare), the Court cannot resolve the Fund's summary motion with respect to Claim B-11.

## IV.    Remand

The Fund urges the Court to remand the case if summary judgment is granted in favor of Montefiore. Because a district court's review is limited to the administrative record, ordinarily, the court must remand to the claims administrator. Miller v. United Welfare Fund, 72 F.3 1066,

1071 (2d Cir. 1995) (remanding to Trustees upon finding that Trustees' decision was arbitrary and capricious). The Court of Appeals has recognized, however, that remand is unnecessary where "no new evidence could produce a reasonable conclusion permitting denial of the claim" or it would "be a useless formality." Id. (internal citations and quotations omitted).

Some courts have suggested that remand is more appropriate only under an arbitrary-and-capricious standard of review because the court must defer to the administrator's findings. See MacMillan v. Provident Mut. Life Ins. Co. of Philadelphia, 32 F. Supp. 2d 600, 616 (W.D.N.Y. 1999) (citing Casey v. Uddeholm Corp., 32 F.3d 1094, 1099 n.3 (7th Cir. 1994) (on de novo review, district court need not remand to administrator, but can resolve disputed factual issues in bench trial). In such cases, it is argued, remand would only waste time and effort because the case could return to the court and no deference would be paid to the administrator's decisions.

Here, however, the question presented was one of contract interpretation. It is my recommendation that Court reject the Fund's interpretation of its reimbursement obligation. Should the Court adopt this recommendation, the Fund will be directed to determine the maximum amount it pays an in-network provider for the same services provided by Montefiore, and reimburse the hospital at that rate. The parties have not provided the Court with list of in-network rates paid for the services at issue. Accordingly, it is appropriate to permit the Fund, in the first instance, to reconsider the claims in light of the Court's ruling. This remedy is not only consistent with the case law, but also will likely result in a resolution of this dispute that is more cost efficient and timely than if the matter were to proceed to trial. See Schroeher v. United Parcel Service Business Travel Acc. Ins. Plan, 06 Civ. 4113 (SJF)(AKT), 2009 WL 1097558, at *1 (E.D.N.Y. Apr. 21, 2009) (recognizing the court's discretion whether to remand or hold a

bench trial, and determining that remand was more appropriate notwithstanding *de novo* review of the administrator's denial of claims).

## CONCLUSION

Accordingly, I recommend that Montefiore's summary judgment motion be GRANTED, and the Fund's cross-summary judgment motion be DENIED. I further recommend that this case be remanded to the Fund so that it can reconsider Montefiore's claims as directed by the Court. The Fund must reconsider these claims within the time constraints set forth in the Plan.

On the record presented, I cannot determine as a matter of law whether Montefiore exhausted administrative remedies with respect to claim B-11. Rather than hold a trial on this issue, the parties are directed to meet-and-confer to determine whether claim B-11 should be remanded along with all other claims for purposes of judicial efficiency. Should the parties seek a judicial resolution, the Court may conduct a hearing on this one claim.

SARAH NETBURN
United States Magistrate Judge

Dated:      New York, New York
            December 2, 2016

\*               \*               \*

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Ronnie Abrams at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Abrams. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).